UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION


Scott Hutchison,  　　　　　　　　　　　　　　　Case No.  3:12-cv-320

　　　　　　　Plaintiff

　　　v.  　　　　　　　　　　　　　　　　　　　MEMORANDUM OPINION
　　　　　　　　　　　　　　　　　　　　　　　　& ORDER

John R. Parent,

　　　　　　　Defendant


### BACKGROUND

In July 2004, Scott Hutchison and John R. Parent went into business together and formed JPSH, LLC, an Indiana limited liability company.  The purpose of JPSH was to "purchase[ ], rebuild [ ] and build[ ] apartment buildings throughout the United States."  (Doc. No. 1 at ¶ 6).  Hutchison provided the "labor and knowledge in performing the construction necessary to build/rebuild the projects" while Parent's "contribution was to finance those projects."  (*Id.* at ¶ 8).  Hutchison and Parent were the sole members of JPSH, with Parent having a 51 percent interest (Doc. No. 92-19 at p. 22) and being the operating member of the entity.

Among his other business ventures, Parent was also a shareholder and officer of J-J Parent Corporation.

JPSH sought properties offered for sale at auctions by the Department of Housing and Urban Development.  Among the properties purchased by JPSH between 2004 and 2005, one was located in Salyersville, Kentucky ("Magoffin Manner") and one in Eunice, Louisiana ("Beulah

Gardens"). There is no dispute that following the purchase of these properties by JPSH, renovations ensued to the properties along with managing the current tenants.

Parent advanced funds to JPSH for renovations from 2004 to 2006. (Doc. No. 1 at ¶ 10). Hutchison alleges those advances, initially designated as capital contributions, were "systematically changed . . . from capital contributions to loans without approval of the other member of JPSH." (*Id.*)

Somewhere in this time frame, Parent also became aware of previous debts incurred by Hutchison. (Doc. No. 84-1, p. 197-198). As a result, Parent advanced Hutchison $100,000 in return for a promissory note dated February 2007. (Doc. No. 92-16, pp. 5 and 16). Additional monies were advanced, according to Parent's amended counterclaim. (Doc. No. 92-16, ¶¶ 48-50).

Parent's concerns regarding Hutchison's creditors and the protection of his (Parent's) investment led him to execute the following notes and mortgages, on behalf of JPSH, on these properties:

- Collateral Mortgage of Beulah Gardens for $1.5 million in favor of J-J Parent Co. signed on July 18, 2008 (Doc. No. 92-2);
- Collateral Promissory Note by JPSH to J-J Parent Co. for $1.5 million signed on July 18, 2008 (Doc. No. 92-3);
- Mortgage of Magoffin Manor for $1.5 million to J-J Parent and signed on July 18, 2008 (Doc. No. 92-4);
- Mortgage Note by JPSH to J-J Parent Co. for $1.5 million and signed on July 18, 2008 (Doc. No. 92-5); and
- Hand Note by JPSH to J-J Parent Co. for $1.495 million signed on July 18, 2008. (Doc. No. 92-6).

Hutchison also signed the notes on behalf of JPSH.

It is undisputed that JPSH did not make any of the monthly payments as required in the mortgages and notes. JPSH's federal tax returns for 2008-2009 show a net operating loss for each of these years. (Doc. Nos. 92-7 to 92-12). After the execution of these documents, no payments were remitted by JPSH on their obligations. Subsequently, J-J Parent Co. initiated foreclosure proceedings against Magoffin Manor in Kentucky and against Beulah Gardens in Louisiana.

Beulah Gardens was sold at sheriff's sale on March 20, 2009 to J-J Parent Co. for $897.13. (Doc. No. 92-14). On July 31, 2009, Magoffin Manor was sold at auction to J-J Parent Co. for $533.400.00. (Doc. No. 92-13). Following the acquisition of these properties, J-J Parent organized two wholly-owned limited liability companies, Beulah Gardens, LLC and Magoffin Manor, LLC, to hold title to these properties.

On September 7, 2009, Hutchison filed suit in the Lucas County Court of Common Pleas against Parent and J-J Parent Corp. The case was placed on the commercial docket and assigned to Judge Gene Zmuda. *Hutchison v. Parent et al.*, Case No. CI 2009-6662 ("*Hutchison I*"). Hutchison alleged a willful failure to make payments on the notes which resulted in the foreclosures. Parent counterclaimed on personal loans by Hutchison to JPSH as well as misappropriation of funds for a total of $177,000.00. (Doc. No. 92-16, p.6).

In November 2010, Hutchison filed a second amended complaint against Parent and J-J Parent. (Doc. No. 92-15). On February 8, 2012, Hutchison filed a notice of voluntary dismissal of his amended counterclaim. (Doc. No. 92-17). The case was scheduled for trial in April 2012. On April 18, 2012, the parties entered into a consent judgment, which Judge Zmuda approved, regarding Parent's counterclaims against Hutchison in the amount of $153,000.00. (Doc. No. 92-18).

One day after the notice of his voluntary dismissal in state court, Hutchison filed the instant action alleging the same claims against Parent and additional claims against Parent's accountant Thomas Danford. On January 15, 2014, I dismissed Danford from this litigation by granting his motion to dismiss for lack of personal jurisdiction. (Doc. Nos. 118 and 119).

This matter is now before me on cross-motions for summary judgment by the remaining parties. Also before me are the relevant responses, replies and surreplies. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332. For the reasons stated below, the motions for summary judgment are denied.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party bears the initial responsibility of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may meet this burden by demonstrating the absence of evidence supporting one or more essential elements of the non-movant's claim. *Id.* at 323-25. Once the movant meets this burden, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (*quoting* FED. R. CIV. P. 56(e)).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, Rule 56(e) "requires the nonmoving party to go

4

beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324; *see also Harris v. General Motors Corp.*, 201 F.3d 800, 802 (6th Cir. 2000). Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

"In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences therefrom in a light most favorable to the nonmoving party." *Williams v. Belknap*, 154 F. Supp. 2d 1069, 1071 (E.D. Mich. 2001) (citing *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987)). However, "'at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter,'" *Wiley v. U.S.*, 20 F.3d 222, 227 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 249); therefore, "[t]he Court is not required or permitted . . . to judge the evidence or make findings of fact." *Williams*, 154 F. Supp. 2d at 1071. The purpose of summary judgment "is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 130 F. Supp. 2d 928, 930 (S.D. Ohio 1999). Ultimately, this Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52; *see also Atchley v. RK Co.*, 224 F.3d 537, 539 (6th Cir. 2000).

### CROSS-MOTIONS FOR SUMMARY JUDGMENT

Hutchison moves for summary judgment on his claims of breach of fiduciary duties and breach of contract. He contends there is no genuine issue of material fact that Parent violated fiduciary duties and the operating agreement, thereby entitling him to summary judgment. Parent advances three[1] arguments in support of his motion for summary judgment. He contends that

---

[1] Parent also moved for dismissal of the seventh cause action for noncompliance with Fed. R. Civ. P. 9(b). (Doc. No. 92-1 at pp. 17-18). The seventh cause of action, conspiracy, was alleged as against both Parent and Thomas Danford. (Doc. No. 1). Judge Zouhary dismissed this claim on May 30, 2012, without prejudice. (Doc. No. 18). The docket does not

Hutchison's voluntary dismissal of his state court claims bars his claims from consideration under the doctrine of *res judicata*. Second, any actions by Parent which allegedly breach the Operating Agreement were subsequently ratified by JPSH. Third, the foreclosures on JPSH were not in breach of Parent's fiduciary duties.

1. Effect of State Court Voluntary Dismissal

Parent argues that under Ohio Civil Rule 13(A), Hutchison's voluntary dismissal in state court was ineffective insofar as it renders Hutchison's claims, refiled in this instant litigation, subject to the doctrine of *res judicata*. This is because the counterclaims filed by Parent in the state court litigation were compulsory counterclaims. Parent charges the Plaintiff's Ohio Civil Rule 41(A) dismissal as ineffective in dismissing those claims without prejudice.

A voluntary dismissal without prejudice is addressed by Ohio Civil Rule 41(A) as follows:

> **(A)** **Voluntary dismissal; effect thereof.**
>
> **(1)** **By plaintiff; by stipulation.** Subject to the provisions of Civ. R. 23(E), Civ. R. 23.1, and Civ. R. 66, a plaintiff, without order of court, may dismiss all claims asserted by that plaintiff against a defendant by doing either of the following:
>
> (a) Filing a notice of dismissal at any time before commencement of trial unless a counterclaim which cannot remain pending for independent adjudication by the court has been served by that defendant; . . .
>
> Unless otherwise stated in the notice of dismissal or stipulation, the dismissal is without prejudice, except that a notice of dismissal operates as an adjudication upon the merits of any claim that the plaintiff has once dismissed in any court.

A compulsory counterclaim is addressed in Ohio Civil Rule 13(A) as follows:

> **(A)** **Compulsory counterclaims.** A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction. But the

---

reflect an amended complaint which renewed this cause of action. Additionally, Danford was dismissed from this case in January 2014. (Doc. No. 119).

pleader need not state the claim if (1) at the time the action was commenced the claim was the subject of another pending action, or (2) the opposing party brought suit upon his claim by attachment or other process by which the court did not acquire jurisdiction to render a personal judgment on that claim, and the pleader is not stating any counterclaim under this Rule 13.

Hutchison's Second Amended Complaint was based upon conduct involving the notes and mortgages regarding the Kentucky property (Magoffin Manor) and the Louisiana property (Beulah Gardens). That conduct alleged misrepresentations made to Hutchison which caused him to sign multiple notes and mortgages as a member of JPSH. Additionally, Hutchison charged that Parent, on behalf of JPSH failed to make mortgage payments, causing default on the notes and set up the subsequent foreclosure, which benefited J-J Parent Corporation.

Parent asserted the following three counterclaims in the state court litigation:

<u>FIRST CLAIM</u>

46. John R. Parent, II advanced money to Scott Hutchison upon his promise to repay, and subsequently received from Scott Hutchison his Balloon Payment Promissory Note, dated February 13, 2007, in the face amount of $100,000.00, a duplicate of which is attached hereto and incorporated herein as Exhibit A.

47. Scott Hutchison owes John R. Parent, II the amount of the Note, together with Interest thereon as set forth in the instrument.

<u>SECOND CLAIM</u>

48. On or about July 24, 2006, John R. Parent, II advanced the sum of $27,000.00 to Scott Hutchison upon his promise to repay it.

49. Scott Hutchison has failed to repay the sum advanced.

50. Scott Hutchison owes John R. Parent, II the sum of $27,000.00, together with interest at the statutory rate.

<u>THIRD CLAIM</u>

51. Scott Hutchison has misappropriated funds from JPSH, LLC by purportedly borrowing such from JPSH, LLC, but without permission to do so, in an amount not yet fully determined but reasonably believed to be in excess of $50,000.00.

52. Scott Hutchison owes John R. Parent, II the sum of $50,000.00, together with interest at the statutory rate.

(Doc. No. 92-16 at p. 6).

A plaintiff has an undisputed right to dismiss an action once, without prejudice, and before the commencement of trial unless it involves a counterclaim which cannot be adjudicated independently. *Holly v. Osleisek*, 40 Ohio App.3d 90, 91 (1988), citing Ohio Civil Rule 41(A)(1)(a). "The party asserting preclusion bears the burden of demonstrating that the claim or issue is barred." *Leatherworks Partnership v. Berk Realty*, 247 Fed. App'x. 676, 679 (6th Cir. 2007), citing *Goodson v. McDonough Power Equip., Inc.*, 2 Ohio St.3d 193 (1983).

The test for determining a compulsory counterclaim under Ohio Civil Rule 13(A) was enunciated by the Supreme Court of Ohio as follows:

> (1) Does the claim exist at the time of serving the pleading [ ]; and (2) does the claim arise out of the transaction or occurrence that is the subject matter of the opposing claim.

*Geauga Truck & Implement Co. v. Juskiewicz*, 9 Ohio St.3d 12, 14 (1984). Another consideration is whether the counterclaim could have been brought as a separate action and was capable of being adjudicated independently per Ohio Civil Rule 41(A)(1)(a). See e.g., *Wells Fargo Bank, Nat'l Assn. v. Wick*, 2013 WL 6571830 *3 (Ohio App.8 Dist. 2013); *Howard v. Sunstar Acceptance Corp.*, 2001 WL 481936 (Ohio App. 10 Dist. 2001).

While the loans to Hutchison were made during the life of JPSH, LLC, I cannot find they arise out of the same transaction or occurrence to characterize them as compulsory counterclaims. Parent's claim as to misappropriation of funds is related insofar as it is alleged to have occurred during Hutchison's affiliation with JPSH, but otherwise has no affiliation to the notes and mortgages which form the basis of Plaintiff's claims sufficient to render them compulsory. Similarly, Parent's allegation on the misappropriation of funds, while occurring during the life of JPSH, is a claim which could stand on its own, independent of Hutchison's claims. As Parent's counterclaims are

capable of independent adjudication, they are not, in my opinion, compulsory counterclaims. Therefore, Defendant's argument on this issue is without merit.

1. <u>Fiduciary Duties and Indiana Limited Liability Companies</u>

As both parties move for summary judgment on the issue of fiduciary duties and the operating agreement, those arguments are considered in tandem.

The history and status of limited liability law was best summarized by an Indiana appellate court as follows:

> Limited liability companies, such as the ones at issue here, were not available in Indiana until the enactment of Indiana's Business Flexibility Act in 1993. <u>Ind.Code § 23-18-1 *et seq.*</u> The popularity of LLCs has forced courts nationwide to address traditional business issues in terms of this statutory creation. In Indiana, there is little case law regarding LLCs and hardly any case law concerning fiduciary duties in the LLC context. In light of this limitation, we decided in *Purcell v. Southern Hills Investments, LLC*, 847 N.E.2d 991, 997 (Ind. Ct. App. 2006), that "common law fiduciary duties, similar to the ones imposed on partnerships and closely-held corporations, are applicable to Indiana LLCs."
>
> Shareholders in a closely-held corporation, . . . , owe each other fiduciary duties. *G & N Aircraft, Inc. v. Boehm*, 743 N.E.2d 227, 240 (Ind. 2001). In such a corporation, "[t]he fiduciary must deal fairly, honestly, and openly with his corporation and fellow stockholders. He must not be distracted from the performance of his official duties by personal interests." *Id.*

*Abdalla v. Qadorh-Zidan*, 913 N.E.2d 280, 285 (Ind.Ct.App.2009).

In the context of a breach of fiduciary duty, an Indiana federal court expanded on the statutory framework in the following manner:

> The Indiana Business Flexibility Act includes several requirements of a limited liability company and its members to provide information about the company to other members consistent with Indiana common law. Members of a limited liability company owe fiduciary duties to one another similar to those of shareholders in a closely-held corporation. . . Specifically, members of a limited liability company "shall give to the extent the circumstances allow just, reasonable, true and full information on all things affecting the members to any member. . . upon reasonable demand for any purpose reasonably related to a member's interest as a member of the limited liability company." <u>Ind. Code § 23-18-4-8(c)</u>.

*Grant v. Van Natta*, 2013 WL 466212 *9 (S.D. Ind. 2013).

An Indiana LLC operating agreement may "eliminate or limit the personal liability of a member or manager for monetary damages for breach of a duty . . . ." Ind. Code § 23-18-4-4[2].  In the absence of a stance on the duties of LLC members or managers, the Indiana courts apply traditional common law principles regarding fiduciary duties.  *Credentials Plus, LLC v. Calderone*, 230 F.Supp.2d 890, 899 (N.D. In. 2002).

The Operating Agreement for JPSH addresses the management of the LLC in the following pertinent sections:

> 4.1. <u>Management Authority of Members</u>.  The business, operations and affairs of the Company shall be managed by all of the Members, who shall have the powers, duties and authority described in this Section and under the Act and the Articles.  The Members shall have the power on behalf of the Company to:  enter into contracts; acquire property and to lease all or any portion thereof; sell, assign, or transfer for value all or any portion of the property of the Company; borrow money and, as security therefore, assign, mortgage, encumber, hypothecate or pledge all or any part of the property of the Company; obtain replacements for any such mortgage or mortgages; prepay, in whole or in part, refinance, recast, increase, modify or extend any mortgages; lend money or guarantee loans to affiliates; enter into contracts to provide construction, renovation, repair, organizational, managerial or other services; exercise and fulfill the rights, powers and duties of the Company, acting in its capacity as general or limited partner of any partnership in which it is a partner; to employ from time to time persons, firms or corporation in the operation of the company business, including, without limitation, accountants and attorneys, on such terms and for such reasonable compensation as the Members shall determine, do all lawful things under the Act; and, to execute, acknowledge and deliver any and all instruments to effectuate the foregoing.  By way of extension of the foregoing and not in limitation thereof, the Members shall, except as otherwise provided in this Agreement, have all the management rights and powers granted to members by the Act and the Articles.  No assignee or transferee for value of all or any portion of the property of the Company shall be required to investigate the Members' authority to sell, assign, transfer for value, if executed by the Members, shall bind the Company.

---

[2] In April 2013, the statute was amended as follows: (a) A written operating agreement may do one (1) or more of the following:
    (1)  modify, increase, decrease, limit, or eliminate the duties (including fiduciary duties) or the liability of a member of manager for breach of the duties set forth in <u>section 2(a)</u> of this chapter.

Ind. Code § 23-18-4-4(a)(1). (Eff. July 1, 2013).

4.2.     Operating Member.  Notwithstanding the terms of Section 4.1 above, John Rex Parent, II, who shall have the title of "Operating Member", shall oversee and direct the day-to-day operations of the Company in accordance with the policies and decisions adopted by the Members.  Without limiting the foregoing, the Operating Member shall have the authority to employ persons, make contracts, and sell or encumber property of the Company so long as each such activity will not result in the expenditure of funds of the Company of more than $100,000.00 and so long as a report of such activity is delivered to the Members at the beginning of the month after which it occurs.

Further, the Operating Member shall have the power to execute or file any document required or permitted to be executed or filed on behalf of a limited liability company under the Act.  The Operating Member shall only be entitled to compensation from the Company for his duties as Operating Member as it specifically approved by a Majority in Interest of the Members.

4.3.     Conflicts of Interest.  The validity of any transaction, agreement or payment involving the Company and  Member or any affiliate thereof otherwise permitted by the terms of this Agreement shall not be affected by reason of the relationship between the Company and the Member or such affiliate, if all of the non-interested Members consent in writing thereto.

4.4.     Exculpation.  Except as otherwise expressly provided by the Act or herein, no Member shall be liable, responsible or accountable in damages or otherwise to the Company, or to any Member for any acts or omissions performed or omitted in good faith and in a manner reasonably believed by the Member to be within the scope of the authority conferred upon him by this Agreement and in the best interests of the Company.  Specifically, and without limiting the scope of the foregoing, the Operating member shall not be liable, responsible or accountable in damages or otherwise to the Company or any other Member for any action taken by the Operating member in good faith, including, but not limited to, any actions taken by the Operating member as "tax matters partner" in connection with the examination by the Internal Revenue service of the Company's federal or state income tax returns or the determination, protest, adjustment or adjudication of any federal or state income tax liability of any Member resulting from the Company's activities.

4.5      Indemnification.  The Company shall indemnify and hold harmless each Member from and against any loss, expense, damage or injury suffered or sustained by him by reason of any acts or omissions or alleged acts or omissions arising out of his activities on behalf of the Company or in furtherance of the interests of the Company, including, but not limited to , any judgment, award, settlement, reasonable attorney's fees and other costs or expenses incurred in connection with the defense of any actual or threatened action, proceeding or claim, provided that the act or omissions, or alleged acts or omissions, upon which such actual or threatened action, proceeding or claim is based were preformed or omitted in good faith and in a manger reasonably believed by the Member to be within the scope or the authority conferred upon the Member by this Agreement and in the best interests of the Company.  Such indemnification shall be made only to the extent of assets of the Company.

      4.6.    <u>Right of Members to Pursue Other Ventures</u>. The Members shall devote to the conduct of the Company business so much of their time as may be reasonably necessary for the efficient operation of the Company business. The Members may engage in and/or possess an interest in other business ventures of every nature and description, independently or with others, including, but not limited to, the ownership, financing, leasing, operation, management, syndication, brokerage, and development of reason and/or personal property wherever located, and neither the Company nor the Members shall have any rights in and to said independent ventures or the income or profits derived therefrom.

(Doc. No. 92-19 at pp. 6-8).

With those guiding principles in place, I now turn to the parties' arguments supporting their respective positions.

Per the terms of the Operating Agreement Parent contends he had authority to authorize the execution of notes and mortgages, to enforce his affiliate's rights on the notes and mortgages, and no duty to contribute additional capital to JPSH to prevent a default on the notes and mortgages. Upon these arguments, Parent seeks summary judgment on all claims.

Hutchison seeks summary judgment on two of the five remaining claims, breach of fiduciary duty and breach of the operating agreement. In support of his motion, Hutchison contends Parent failed meeting his fiduciary duties by "fraudulently obtaining a note and mortgage signed by the Plaintiff, failing to pay the mortgage payment due and owing by JPSH, and then not notifying Plaintiff of the problems, failure to make payment on the notes, and then buying the properties at the foreclosure sales", without advising Plaintiff in advance of these events.

Having carefully reviewed the briefs and admissible evidence in support, I find there to be genuine issues of material fact when considering Indiana common law fiduciary duties, thereby precluding summary judgment for either side.

The parties are unable to agree on the duties in question. For example, Parent states he had no affirmative duty to continue his funding of JPSH, LLC, nor did he violate any duties in foreclosing on the relevant mortgages per the terms of the Operating Agreement. However, Hutchison's quarrel with Parent is how he went about achieving these goals without notifying the other member of JPSH, LLC:

> The Defendant traveled to Ohio to have a note signed by the Plaintiff in the amount of $1.5 million. After obtaining the note, the Defendant, as operating member and sole custodian of the checking account records, made no payments on the note. Defendant then hired an attorney to represent his other companies in a foreclosure action to collect on the note, and never responded to offers to purchase the real property that were in amounts in excess of the note amount. The Defendant never hired an attorney to represent JPSH in the foreclosure action even though he owned 51% of the company and was the operating member. Defendant never notified Plaintiff of the default in payment or the foreclosure action and failed to take into consideration the affect [sic] it would have on Plaintiff.

(Doc. No. 95, p. 6).

The diametrically opposing positions present questions of fact regarding the common law fiduciary duties of dealing fairly, honestly, and openly with other members. *Credentials Plus, LLC*, 230 F.Supp.2d at 898. Therefore, summary judgment as a matter of law cannot be granted with these factual disputes unresolved.

## CONCLUSION

Accordingly, the cross-motions for summary judgment (Doc. Nos. 92 and 95) are denied.

So Ordered.

s/ Jeffrey J. Helmick<br>
United States District Judge